UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | 22-CR-600 (LAP) | |
| -against- | | |
| LAMAR WILLIAMS, | ORDER | |
| Defendant. | | |

LORETTA A. PRESKA, Senior United States District Judge:

Defendant Lamar Williams is charged in a three-count Indictment with participating in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1) (Count Two); and murder through use of a firearm in violation of 18 U.S.C. § 924(j) (Count Three).  (See Dkt. 1 ("Indictment").)  The pretrial conference is scheduled for January 28, 2026, with jury selection slated to commence on February 2, 2026.

On January 6, 2026, the Government and Defendant each filed multiple motions in limine to admit or preclude certain evidence.[1] This Order addresses those motions.

---

[1] Government Motions in Limine dated January 6, 2026, Dkt. 48 ("Gov. Mot."); Defendant Motions in Limine dated January 6, 2026, Dkt. 49 ("Def. Mot."); Government Memorandum in Opposition dated January 13, 2026, Dkt. 50 ("Gov. Opp."); Defendant Response in Opposition dated January 13, 2026, Dkt. 51 ("Def. Opp.").

**FACTUAL BACKGROUND**

The following facts are drawn from the Indictment and the evidence proffered in the parties' motions.

The Indictment alleges that, from at least in or about 2013 through 2022, Williams was a member of the Mac Baller Brims (the "Mac Ballers"), a subset of the national Bloods gang that operates in and around the Bronx River Houses in New York and in Easton, Pennsylvania. (Indictment ¶¶ 1-7.)  The Mac Ballers' leaders during the relevant period included Antwan Vareen, Carl Wilbright, and Ronnie West.  (Id. at 4.)  As alleged in the Indictment, Williams was a member of the Mac Ballers who sold drugs with the gang and participated in acts of violence on its behalf. (Id. at 4-5.)

As part of Mac Ballers' drug distribution efforts, the Government alleges that the Mac Ballers employed an arbitrage strategy to purchase crack cocaine in New York City and sell the drugs at higher prices elsewhere in the country, including Easton, Pennsylvania.  (Gov. Mot. 2-4.)  The Mac Ballers allegedly employed two dive bars in Easton for this purpose: Louie's and Eddie G's. The Government intends to call as a witness a bartender who worked at both bars ("Woman-1").

Woman-1 is expected to testify that she developed a sexual relationship with Wilbright and agreed to permit the Mac Ballers to sell cocaine and store firearms at both bars.  In return, Woman-

2

1 received a cut of the Mac Ballers' drug profits.  As Woman-1 gained the Mac Ballers' trust, she became tasked with transporting various Mac Ballers, including Williams, from the Bronx River Houses to Easton to sell drugs.  (Gov. Mot. 5.)

Over time, Wilbright's relationship with Woman-1 became strained.  Shortly after Woman-1 and Wilbright began seeing each other, Woman-1 began another sexual relationship with Rasheed Barton—a member of the rival Crips gang—who also sold crack cocaine in Easton.  When Wilbright learned that Woman-1 had slept with Barton, Wilbright became violent towards Woman-1[2] and ordered that Barton be targeted for reprisal.  (Gov. Mot. 6.)

The Government alleges that it was Williams who carried out Wilbright's directive.  According to the Government, on or about August 11, 2013, West spotted Barton in the Bronx and informed other Mac Ballers, including Williams, that Barton was a "Mac deal," or a target whose murder would enhance the killer's status within the gang. (Gov. Mot. 7-8.)  Williams allegedly then obtained a .22-caliber firearm and shot Barton.  (Id.)

Woman-1 is expected to testify that news of Williams' shooting of Barton quickly spread amongst the Mac Ballers.  (Gov. Mot. 35.) Word apparently reached the Crips, too.  On April 3, 2014,

---

[2] In June of 2013, at Wilbright and Vareen's direction, Woman-1 was allegedly stabbed by several women in Easton. (Gov. Mot. 7).

approximately eight months after Barton was killed, Williams was shot by a Crip in what the Government contends was retaliation for Williams' murder of Barton.  (Gov. Mot. 8.)  When police responded to the shooting, they recovered a .380-caliber firearm from a trash compactor in the building where Williams was found. (Gov. Mot. 8, 14.)  The following day, officers interviewed Williams at a precinct.  According to the Government, at the conclusion of that interview, Williams left behind a water bottle from which police later extracted DNA that matched DNA found on the recovered .380 firearm.  (Id. at 4-5.)

In the years following the alleged murder of Barton, the Government alleges that Williams continued his membership in the Mac Ballers.  In particular, between 2016 and 2021, Williams released various music videos under the stage name "Chase Money Marz," which the Government alleges to contain references to both Williams' activities in the Mac Ballers and shooting of Barton. (Gov. Mot. 8.)

## PROCEDURAL HISTORY

On January 6, 2026, the Government filed its motions in limine seeking to admit: (1) evidence of Williams and his co-conspirators' racketeering conduct and related bad acts; (2) clips from rap music videos Williams released under the stage name "Chase Money Marz"; (3) statements made to Woman-1 by Williams' co-conspirators and by

4

Barton; (4) portions of a 911 call made by a witness to the Barton shooting; (5) self-authenticating business and medical records from Meta and St. Luke's Hospital; (6) a PowerPoint summary of voluminous Meta records; and (7) limited autopsy photographs.  The Government also moved to preclude Defendant from impeaching Woman-1 and a retired NYPD detective ("Detective-1") with misdemeanors and an administrative complaint.  (See generally Gov. Mot.)

On the same day, Defendant filed his motions in limine seeking to: (1) exclude or limit uncharged prior bad acts; (2) exclude rap lyrics and music videos; (3) limit gang evidence; (4) exclude or limit autopsy photographs; (5) limit ballistics testimony to the laboratory's "inconclusive" finding; (6) require proper authentication of social media evidence; (7) require the performing pathologist to testify; (8) compel early Brady/Giglio disclosures; and (9) suppress DNA evidence obtained from the water bottle seized on April 4, 2014. (See generally Def. Mot.)

From the Court's perspective, several issues raised in the parties' original motions have been mooted by stipulation or representations in the parties' oppositions.

First, the Court understands Defendant's motion to limit "gang expert" testimony, (Def. Mot. 15), is moot because the

Government represents that it "did not notice a 'gang expert' and does not intend to call one."  (Gov. Opp. at 7.)[3]

Second, Defendant's motion to limit ballistics testimony regarding whether two bullets were fired from the same firearm (Def. Mot. 17-18) is moot because the Government represents that its "ballistics expert's testimony will be limited to her conclusion that the bullets found in Barton's body were .22-caliber rounds" and that the expert will not testify "that one firearm discharged both bullets."  (Gov. Opp. at 7.)

Third, Defendant's Crawford motion requiring the performing pathologist to testify (Def. Mot. 19) is moot because the Government "intends to call" Dr. Margaret M. Prial, the pathologist who performed the autopsy.  (Gov. Opp. at 8.)

Fourth, Defendant's motion to compel early Brady/Giglio and Jencks Act disclosures (Def. Mot. 20-21) is presently moot because the Government represents that it "intends to provide that information for all its witnesses at least one week before trial." (Gov. Opp. at 8.)

_____

[3] The Court understands that the Government has proffered Officer Hernandez as an expert in the drug trade, rather than as a "gang expert."  The Court will separately address Defendant's January 13, 2026 motion to preclude Officer Hernandez' testimony.  (Dkt. 52.)

6

Fifth, both parties' motions regarding autopsy photographs (Gov. Mot. 63-64; Def. Mot. 16) are resolved because Defendant "will not be objecting to their admission at trial, provided a proper foundation is made."  (Def. Opp. at 11.)

Sixth, the Government's motion to preclude Defendant from cross-examining Woman-1 regarding her 2009 misdemeanor fraud conviction (Gov. Mot. 57-58) is resolved because Defendant represents he "does not intend to question Woman-1 regarding her misdemeanor fraud conviction." (Def. Opp. at 10.)

With these issues mooted, the Court addresses below only those issues that remain contested.  Naturally, if any of the above issues have since become disputed, the parties should promptly raise the issue at the January 28 pretrial conference or by letter to the Court.

## EVIDENTIARY MOTIONS

### I.   Enterprise Evidence and Uncharged Conduct

The Government has moved, over Defendant's Rule 403 and 404(b) objections, to introduce evidence of various conduct involving Williams and the Mac Ballers that spans from approximately 2007 through 2018.  (Gov. Mot. 9.)  Broadly speaking, the Government's evidence falls into three timeframes.

First, the Government seeks to admit evidence of conduct that predates the charged conspiracy, including: (i) a knife attack in

Times Square in the "late 2000s or early 2010s" in which Williams and other gang members from the Bronx River Houses participated; (ii) a schoolyard shooting in or about 2012 in which Williams shot at rivals from Stratford Avenue; (iii) another shooting on Stratford Avenue in or about 2012 in which Williams and other Mac Ballers shot a rival gang member in the legs; and (iv) evidence generally of Williams' membership in the Mac Ballers, drug dealing, and firearms possession in connection with the Mac Ballers prior to 2013.  (Gov. Mot. 18-19.)

Second, the Government seeks to admit evidence of conduct by Williams and alleged co-conspirators during the charged conspiracy, including: (i) the February 9, 2013 murder of Damian Frazier at "Eddie G's" bar in Pennsylvania, in which Williams allegedly participated with Vareen, Wilbright, and others; (ii) Vareen's domestic violence after learning his girlfriend had sexual relations with Barton; (iii) Wilbright's pattern of threats and domestic abuse against Woman-1 and his attempts to control her bars; (iv) Wilbright's June 9, 2013 attempted murder of Woman-1 by directing women to stab her; (v) the Mac Ballers' drug distribution activities in Easton and related firearms possession; and (vi) Williams's provision of false identification information to police in Allentown, Pennsylvania on August 22, 2013, eleven days after the Barton murder. (Gov. Mot. 12-14, 21-22.)

8

Third, the Government intends to offer evidence of the April 3, 2014 shooting of Williams by the Crips and the .380-caliber firearm recovered from a trash compactor at the scene, which the Government intends to link to Williams through DNA analysis. (Gov. Mot. 8, 22.)

### A. Legal Standard

Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Importantly, Rule 404(b) is not implicated where the evidence is "direct evidence" of the charged crime or "inextricably intertwined" with it. United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989). In RICO cases, "evidence of uncharged criminal activity is not considered 'other crimes' evidence under Rule 404(b)" where the evidence "arose out of the same transaction or series of transactions as the charged offense, or if it is necessary to complete the story of the crime" charged. United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000).

Even if evidence relates to "other acts" within the meaning of Rule 404(b), such evidence is nonetheless admissible under Rule 404(b)(2) "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2), provided that the evidence independently satisfies the traditional Rule 403 balancing test and a court issues a limiting instruction upon a defendant's request. United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002).

**B. Discussion**

The Court finds that the enterprise evidence and uncharged conduct proffered by the Government, (Gov. Mot. 9-23), is admissible within the bounds of Rule 404 and Rule 403.

**i.   Rule 404(b)**

First, the Court agrees with the Government that the acts committed during the charged conspiracy period (2013-2022)— including the Frazier murder, the stabbing of Woman-1, Wilbright's threats against Barton and Woman-1, and the April 2014 shooting of Williams—are in fact "direct evidence" of the racketeering conspiracy.  The proffered evidence does not concern "other acts" within the meaning of Rule 404(b) and is instead offered to prove the charged conspiracy itself.  Among other things, the evidence is admissible to show the existence of Mac Ballers enterprise, the nature of the Mac Ballers' activities, and the events that led the Mac Ballers to commission the hit on Barton that Williams is alleged to have carried out.  (Gov. Mot. 18-23.)

Second, to the extent that the Government's proffered evidence predates the conspiracy or is not otherwise direct evidence, that Court finds that such evidence is nonetheless appropriately introduced for a permitted purpose under Rule 404(b). Such evidence is admissible for the Government to prove up Williams's longstanding membership in the Mac Ballers, his knowledge of the gang's violent nature, and his motive to commit violence to maintain or increase his position in the gang. (Gov. Mot. 18-21.) Notably, the Government proffers that cooperating witnesses will testify that Williams frequently cited his pre-2013 acts of violence to demonstrate his standing in the Mac Ballers and that "[t]hat same motivation spurred Williams to shoot Barton in 2013." (Id. at 21.) Provided that the Government can tie these pre-2013 acts to Williams' association with the Mac Ballers, the evidence is admitted for a permissible purpose—namely, motive— under Rule 404(b).

### ii.   Rule 403

Having determined that the above evidence is not precluded by Rule 404, the Court turns to Rule 403. Certainly, Defendant is correct that the evidence proffered by the Government is "prejudicial" to Williams. (Def. Mot. 7). That is to be expected in a murder trial. But the key question under Rule 403 is whether the evidence creates such a prejudicial effect that it

11

substantially outweighs any of its corresponding probative value. See United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995).

Here, the proffered evidence is highly probative in supporting the existence of the Mac Ballers enterprise and the Mac Ballers' motivations for killing Barton. By contrast, the prejudicial effect of the evidence is unlikely to be significant, as Williams' historical association with and participation in the Mac Ballers enterprise is not "any more sensational or disturbing than the crimes with which [Mr. Williams is] charged." United States v. Costanzo, 2025 WL 2628399 at *8 (2d Cir. Sept. 12, 2025).

Finally, the Court rejects Defendant's argument that some of the Government's proffered evidence is too "temporally remote" to warrant admission. (Def. Opp. 7). Defendant focuses on the time that the acts occurred in relation to trial. But as the Government correctly notes, the temporal inquiry is concerned with whether the conduct is temporally remote from the charged conduct, irrespective of when trial occurs. (Gov. Opp. 2.) Accordingly, the Court finds that the Government's proffered evidence is sufficiently close in time to the onset of the charged RICO conspiracy.

Naturally, the Court's ruling does not grant the Government a blank check to introduce uncharged conduct that predates the charged conspiracy. The Court's ruling is conditioned on the assumption that the Government will tie the proffered evidence to

Williams' historical association with the Mac Ballers.   In the event the Government fails to draw that necessary nexus—for example, by introducing isolated testimony that Williams was involved in an uncharged stabbing without any accompanying evidence that it was related in some way to his association with the Mac Ballers—the Court would of course entertain an objection by Defendant to preclude or strike the evidence accordingly.   The Court also invites Defendant to confer with the Government and submit to the Court a proposed limiting instruction regarding the proffered evidence.

## II.   Rap Videos and Lyrics

The Government seeks to admit several video clips from rap music videos and an image from a fifth song that Williams released under the stage name "Chase Money Marz" between 2016 and 2021. The Government contends that these lyrics and videos are evidence of Defendant's membership in the Mac Ballers and his commission of the Barton murder.   Defendant objects to admission of all lyrics on First Amendment, Rule 403 and hearsay grounds.   For the foregoing reasons, the Court will admit most—but not all—of the Government's proffered lyrics.

### A. Legal Standard

The First Amendment does not prohibit the evidentiary use of speech to establish an element of a crime or to prove motive or

intent in a criminal trial.  Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993).  When speech is offered to establish existence of a criminal enterprise and the defendant's connection to it, rather than as the basis for prosecution, there is no First Amendment violation.  United States v. Pierce, 785 F.3d 832, 841 (2d Cir. 2015) (affirming admission of rap lyrics by defendant that mentioned the gang's name and specific actions that the defendant took).

With respect to hearsay, Federal Rule of Evidence 801(d)(2)(a) provides that statements "made by the party in an individual or representative capacity" are not hearsay.  Fed. R. Evid. 801(d)(2)(a).  Consequently, rap lyrics by a defendant are definitionally not hearsay.  United States v. Perez, 2025 WL 551567 at *6 (S.D.N.Y Feb 19, 2025).

Rule 403 prohibits the admission of any evidence where its probative value is substantially outweighed by the risk of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Because rap lyrics typically traffic in hyperbole, parody, and made-up scenarios, the unchecked introduction of such lyrics can pose problems from a Rule 403 standpoint.  See United States v. Jordan, 714 F. Supp. 3d 158, 163 (E.D.N.Y. Jan 30, 2024).  However, rap lyrics are properly admitted where there is a nexus between the lyrics and the charged crime that goes beyond

generalized references to crime and ties the artist's expression to the specific facts and circumstances of the charged crime. See, e.g. United States v. Herron, 2014 WL 1871909 at *8 (E.D.N.Y. May 8, 2014) ("Federal courts across the country, including those in this circuit, have found rap lyrics or videos to be relevant evidence in criminal trials based on the content of the evidence and the issues in the case."); Pierce, 785 F.3d at 841 ("[R]ap lyrics . . . are properly admitted . . . where they are relevant[,] and their probative value is not substantially outweighed by the danger of unfair prejudice."). In this District, rap lyrics are frequently admitted to establish the existence of, and a defendant's participation in, alleged RICO enterprises. See Perez, 2025 WL 551567 at *5.

**B. Discussion**

As a general matter, Defendant's First Amendment and hearsay objections are without merit. Defendant's speech itself is not the proscribed conduct, and therefore its admission as evidence does not violate the First Amendment. Pierce, 785 F.3d at 841. While Defendant gestures to the alleged "chilling effect" that the use of rap lyrics in criminal trials could have on artistic expression, this Court is unaware of any legal authority holding the mere introduction of evidence creates a chilling effect sufficient to violate the First Amendment.

With respect to hearsay, Defendant argues that "the lyrics are embedded in a fictional narrative told from the perspective of a persona" and "not Lamar Williams the individual," (Def. Opp. 6), meaning that they are not party opponent admissions within the meaning of Rule 801(d)(2)(a).  This argument is meritless, and the lone Sixth Circuit case that Defendant cites does not support it.  Certainly, this Court is not aware of any authority in the Second Circuit that permits a defendant to exclude his own statements as hearsay merely because a defendant made the statements from the perspective of a fictional persona.  Because all the lyrics the Government seeks to admit were uttered by Defendant, they are admissible as non-hearsay under Rule 801(d)(2)(a).

The only colorable issue raised by Defendant relates to Rule 403, which requires a case-by-case analysis of each proffered lyric.

### i.    "Bodies" and "Real N****Z Back"

The Court will admit the lyrics from "Bodies" and "Real N****z Back."  The lyrics make specific references to Mac Ballers and the murder of Barton and include imagery that connects the videos and lyrics to Mac Baller territory.  The Government contends, and the Court agrees, that Defendant's identifying himself as "Chase Money Marz" in front of Mac Baller territory is probative of Williams' connection to the Mac Ballers and is not so prejudicial as to

16

outweigh that probative value.  See Perez, 2025 WL 551567 at *6-8 (music video in which the defendant was seen in the presence of other gang members, displaying gang hand signs, and in front of gang headquarters bore the requisite nexus to the RICO charge and was therefore admissible).

Even the more generalized lyrics (such as those in "Bodies," where Williams raps "all my n****s got a body on 'em") are admissible considering the context of the videos.  The Government has proffered evidence that Williams makes Mac Baller hand signs in these videos and is surrounded by other Mac Ballers, which creates the necessary nexus.  See Herron, 2014 WL 1871909 at *12 (where defendant identified as a member of the gang and conversed with gang associates, lyrics were "generally relevant . . . [to] prove the existence and structure of an alleged criminal enterprise and a pattern of criminal activity."); see also United States v. Applins, 637 F.3d 59, 79 (2d Cir. 2011) (affirming admission of rap lyrics that revealed defendant's knowledge of the gang and gang violence).

The same is true for "Real N****z Back," which the Government asserts to contain references to Williams' own shooting in retaliation for his alleged murder of Barton.  According to the Government, these lyrics reference where Williams was shot in Mac Baller territory, the "hit" that someone put on him, and how he had survived the shooting with a "sling."  Such lyrics likewise go

17

beyond generic violent imagery and satisfy the necessary nexus to the charged conduct to warrant admission.  See Perez, 2025 WL 551567 at *6-8.

### ii.   "Might Jus" and "They Know My Body"

On the other hand, unless the Government supplements its offer of proof, the Court presently declines to admit the lyrics from "Might Jus" and "They Know My Body."  In the Court's view, the applicable lyrics, which describe generalized drug activity, do not bear a sufficiently close nexus to the charged crimes and reflect the more generalized references to drug dealing that other courts have found to be unfairly prejudicial.  See, e.g. Jordan, 714 F. Supp. 3d at 166 (even where defendant was charged with narcotics trafficking, references to "breaking down brick" (a reference to drug distribution) were "too imprecise" and did not "bear a specific nexus to the underlying offense").  Of course, if the Government introduces testimony beyond its current proffer that connects these lyrics to the charged conduct, the Court would revisit this ruling.

### iii.   "Doin Shit"

The Court will conditionally admit the lyrics from "Doin Shit" subject to appropriate connection.  In "Doin Shit," Williams makes references to "Birdman," which, in the Government's view, refers to Barton.  So long as the Government's witnesses testify that

18

lyrics were in a fact "coded admission to murdering Barton," (Gov. Mot. 32), the Court will admit these lyrics. Defendant's arguments that "Birdman" could refer to other individuals, such as certain 1990s rappers, go to weight and not admissibility. While Defendant is free to cross-examine the Government's witnesses on such alternative possibilities, the mere historical existence of other self-identified Birdmen is not a basis to preclude the lyrics at this stage.[4]

## III.    Statements by Co-Conspirators and Barton to Woman-1

The Government seeks to introduce several categories of out-of-court statements made to Woman-1 by Williams's co-conspirators (principally Vareen and Wilbright) and by the victim, Barton. These statements can be grouped into four categories.

The first category consists of statements by Vareen, Wilbright, and other Mac Ballers identifying themselves as Mac Ballers and discussing the gang's drug distribution operations at the Easton bars that Woman-1 managed. (Gov. Mot. 34.) According to the Government's proffer, Wilbright told Woman-1 "that only drug dealers approved by him—which included Vareen and Williams—could sell drugs in her bars, and he threatened physical violence against Woman-1 and any other dealer who sold drugs in Louie's or

---

[4] Naturally, if the Government fails to draw the necessary nexus, the Court will entertain a motion to strike the lyrics accordingly.

Eddie G's without Wilbright's permission." (Gov. Mot. 5.)  Woman-1 will testify that she "knew that Vareen, Wilbright, Williams, and their associates were Mac Ballers; that the Mac Ballers were a gang with an intricate hierarchy and leadership structure; that the Mac Ballers had ties in New York and Pennsylvania; that the Mac Ballers committed violence, including murders and attempted murders, on behalf of the gang; and that the Mac Ballers sold drugs together."  (Gov. Mot. 40.)   In addition, Woman-1 will testify about Mac Ballers' statements regarding an uncharged February 9, 2013 murder of Damian Frazier at Eddie G's bar, including Rodriguez's statements to Woman-1 "express[ing] consciousness of guilt" as she drove him from Pennsylvania to Brooklyn after the killing, and "related efforts by the Mac Ballers to enlist Woman-1 to obstruct law enforcement's investigation into that homicide." (Gov. Mot. 13, 34.)

The second category consists of Wilbright's direct threats against Woman-1 and statements expressing jealousy of Barton, including text messages between April and June 2013 in which Wilbright threatened to kill both Woman-1 and Barton. Representative messages include: "I will fuckin kill u and whoever idgaf" and "im going to kill both of yall." (Gov. Mot. 42.)

The third category consists of statements Wilbright made to intimidate Woman-1 at a hotel shortly after the Barton murder. Among other topics, the Government indicates that Woman-1 will

20

testify that Wilbright told Woman-1 (i) that Wilbright had directed Williams to kill Barton, (ii) that Williams used a .22-caliber firearm to shoot Barton near a corner store in the Bronx, and (iii) that Williams was "young enough to serve time in prison for the Barton homicide, but Wilbright was too old." (Gov. Mot. 35.)

The fourth category consists of statements Barton made to Woman-1 expressing that he was "fearful for his life because he believed that Wilbright was going to kill him." (Gov. Mot. 35.)

### A. Legal Standard

Statements offered for purposes other than proving the truth of the matter asserted are not hearsay. See United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999).  In addition, Rule 801(d)(2)(E) provides that a statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  To invoke Rule 801(d)(2)(E), a district court must find by a preponderance of the evidence that (i) a conspiracy including the declarant and defendant existed; and (ii) the statement was made during the course of and in furtherance of the conspiracy.  Bourjaily v.

United States, 483 U.S. 171, 175 (1987); United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).[5]

Statements that are "merely narrative descriptions by one coconspirator of the acts of another" or "idle chatter" do not qualify as statements in furtherance of a conspiracy. United States v. Johnson, 469 F. Supp. 3d 193, 213 (S.D.N.Y. 2019) (cleaned up). However, "statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy," United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994), such as updating co-conspirators of current developments and issues facing the group. Id. In addition, statements made to intimidate witnesses may also further the conspiracy. See United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989) ("The plot to silence witnesses furthers the goals of the conspiracy in that the distribution of narcotics would be facilitated by the acquittal of all the defendants.")

For statements that are otherwise hearsay, Rule 803(3) provides a hearsay exception for statements of the declarant's

---

[5] In determining whether the conspiracy has been established by the preponderance standard, the district court is not bound by the Rules of Evidence and may consider the hearsay statement itself as evidence of the conspiracy, provided that "there must be some independent corroborating evidence of the defendant's participation in the conspiracy." United States v. Padilla, 203 F.3d 156, 161 (2d Cir. 2000).

22

"then-existing state of mind."  Fed. R. Evid. 803(3).  Rule 804(b)(3) also permits admission of certain statements against a declarant's penal interest when the declarant is unavailable.

**B. Discussion**

The Court agrees that virtually all of these statements to Woman-1, if introduced as proffered by the Government, are admissible as either non-hearsay under Rule 801(d)(2)(e) or under an applicable hearsay exception.

### i.   Co-Conspirator Statements

First, as a general matter, the Court finds that the totality of the Government's proffered evidence shows, by a preponderance of the evidence, that a conspiracy existed and that Woman-1, Vareen, Wilbright, Rodriguez, Williams, and the other declarants with whom Woman-1 spoke and identified as Mac Ballers were part of it.  The statements made by Vareen, Wilbright, and other Mac Ballers to Woman-1 identifying themselves as Mac Ballers and discussing their drug distribution operations are undoubtedly admissible as statements in furtherance of that conspiracy.

As to the statements to Woman-1 about the Frazier murder specifically, the Government notes that the evidence will show efforts by the Mac Ballers to obstruct law enforcement's investigation into the Frazier murder.  Among other things, the Government also proffers that Woman-1 will testify about

Wilbright's "efforts to prevent Woman-1 from cooperating with local law enforcement officers who were investigating Frazier's homicide" and "enlist Woman-1 to obstruct law enforcement's investigation into that homicide." (Gov. Mot. 34.) Provided that the Government lays that foundation, the Government will be permitted to introduce statements regarding the Frazier murder and subsequent obstruction efforts that furthered the Mac Baller enterprise.

Second, Wilbright's various threats to Woman-1 are not hearsay because they are not offered for the truth of the matter asserted. (Gov. Mot. 42.) And to the extent that Wilbright's statements express his jealousy or anger at Woman-1 for her romantic involvement with Barton or association with rival gangs, the Court agrees that those statements are admissible under Rule 803(3) as evidence of Wilbright's then-existing state of mind.

Third, with respect to Wilbright's post-murder hotel statements to Woman-1, the Court also finds that these statements are admissible as both non-hearsay under Rule 801(d)(2)(e) and as exceptions to hearsay under Rule 804. As the Court understands it, the Government will introduce these statements to show the Mac Ballers's efforts to intimidate and silence Woman-1. Provided that there is a sufficient nexus between the threat to Woman-1 and the details that Wilbright described, those statements likewise further the Mac Baller conspiracy. Independently, the Court agrees

that the hotel statements by Wilbright—which effectively amount to a confession of his involvement in the Barton murder—are admissible as statements against Wilbright's penal interest under Rule 804, provided that the Government can establish Wilbright's unavailability at trial through invocation of his Fifth Amendment rights. (Gov. Mot. 44.)

### ii.   Barton's Statements

Finally, regarding Barton's statements expressing fear of Wilbright, the Court rules as follows.  The Government shall be permitted to introduce hearsay testimony that, in sum and substance, Barton told Woman-1 that Barton feared Wilbright would kill him in the future.  In other words, the Court will permit forward-looking statements that Barton made to Woman-1.  But the Court agrees with Defendant that Rule 803(3) does not permit the introduction of backward-looking statements that reference the basis for Barton's fear. (Def. Opp. at 7.)  For example, Woman-1 may not testify to Barton's recounting of prior events that led to the basis for his fear.

## IV.   Social Media Authentication

The Government also seeks to admit social media posts from accounts it attributes to Williams, including Facebook and Instagram accounts under the name "Chase Money Marz."  The Government proffers that it will authenticate the accounts through

selfie-style images of Williams, references to his name and aliases, and references to his birthdate. (Gov. Mot. 24 n.7.)

**A. Legal Standards**

Rule 901(a) requires evidence be authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is."  The rule "does not definitively establish the nature or quantum of proof that is required" to authenticate an item of evidence.  United States v. Vayner, 769 F.3d 125, 130 (2d Cir. 2014). Rather, "there must nonetheless be at least sufficient proof . . . so that a reasonable juror could find in favor of authenticity or identification."  Id.  Such proof may be in the form of circumstantial evidence.  Id.

**B.  Discussion**

The Court agrees that the proffered social media account names, associated photos, and referenced birthdates are sufficient circumstantial evidence for a reasonable juror to find that the social media accounts belong to Williams.  (Gov. Opp. at 2.) Defendant's remaining arguments go to weight, not admissibility. If Defendant feels that there is a genuine dispute as to authenticity (i.e., whether someone could be impersonating Williams) Defendant is of course free to make those arguments to the jury through other means.  But a full-blown Rule 104

26

authentication hearing before publication to the jury is unnecessary at this time.

## V.    Cross Examination of Detective-1

The Government moves to preclude cross-examination of Detective-1 regarding a 2003 Civilian Complaint Review Board ("CCRB") finding that Detective-1 had acted negligently in conducting unlawful searches of a person and apartment without a warrant or probable cause.  (See Gov. Mot. 60-62; Gov. Mot. Ex. 9 ("CCRB Report").)  Defendant contends that the CCRB Report is proper fodder for cross examination of Detective-1 because the CCRB Report noted that Detective-1 "denied" conducting an unlawful search, which raises a credibility issue as to Detective-1.  (Def. Opp. at 10.)

### A. Legal Standards

Rule 608(b) permits inquiry into specific instances of conduct "if they are probative of the character for truthfulness or untruthfulness." Courts have precluded cross-examination into substantiated allegations of misconduct by law enforcement officers that have no bearing on credibility.  See e.g., United States v. Teron, 478 F. App'x 683, 685 (2d Cir. 2012).  However, where the misconduct involves a false statement or adverse credibility finding, it may be probative of truthfulness under

Rule 608.  United States v. Crowley, 318 F.3d 401, 417 (2d Cir. 2003).

## B. Discussion

The Court has reviewed the CCRB Report and concludes that any questioning regarding the 2003 incident should be precluded under both Rules 608 and 403.

First, the Court finds that the unlawful search itself—which, the Court notes, the CCRB found to be "negligent", and not willful—has no bearing on Detective-1's truthfulness for the purposes of Rule 608.  (CCRB Report at 8.)

Second, the CCRB Report does not in any way suggest that Detective-1 gave false testimony to the CCRB or was found to be non-credible.  Indeed, the Report found that Detective-1's account was "largely internally consistent," which is particularly notable given that the report made explicit adverse credibility findings against other officers.  Compare id. with id. at 7 ("Officer [REDACTED] is considerably less credible."); id. at 8 ("[Detective-1] acknowledged that he . . . stepped inside of the apartment.  Officer [REDACTED] denied that he or [Detective-1] set foot in the apartment, but this denial is not credible.")  Whereas the report goes out of its way to note where other officers' denials were non-credible, the report makes no such finding as to Detective-1.

The only "denial" by Detective-1 that the Court can discern is that Detective-1 and a colleague denied conducting an unlawful "search."  (Id. at 8 ("The officers denied that they had searched [the suspect] . . . ."))  While the Report does not elaborate on the substance of the denial, the surrounding context suggests that Detective-1's denial was rooted in his belief he had conducted a permissible "frisk."  (Id.)  At best, the CCRB report simply indicates that the CCRB disagreed with Detective-1's judgment in finding his frisk to constitute an unlawful search.  (Id. (noting that "the right to frisk does not permit an officer to search an individual pocket [which] constitutes a full-blown search that requires probable cause" and concluding that Detective 1's "frisk of [the suspect] did not follow the guidelines established by New York State law."))  Indeed, if Defendant's argument were accepted, any law enforcement officer who offers a legal justification that is later rejected could be considered to have offered "false testimony" and subject to impeachment to under Rule 608.  The Court rejects such logic.

Finally, even if the CCRB did find evidence of a false statement by Detective-1—which, from the record available to the Court, it did not—the attenuation of that conduct, in this Court's view, destroys any probative value under Rule 403.  Accordingly, Defendant shall be precluded from any questioning of Detective-1 regarding the 2003 incident.

## VI.    St. Luke's Hospital and Meta Records

The Government seeks to admit self-authenticating business records from Meta and St. Luke's Hospital pursuant to Rules 803(6) and 902(11), as well as a PowerPoint summary of the voluminous Meta records under Rule 1006. (Gov. Mot. 50-57.)  The Government also seeks to admit certain statements of Woman-1 to St. Luke's hospital as statements made for purposes of medical diagnosis under Rule 803(4).

Defendant has not raised specific objections to these records on hearsay or other grounds, and the Court agrees that the evidence as proffered would be properly authenticated, admissible under hearsay rules, and proper grounds for a Rule 1006 summary exhibit. If Defendant does not raise any objection at the January 28 pretrial conference, the Court will admit these records and the derivative summary chart without objection.

## VII.    Defendant's Offers of Stipulation & Requested Limitations

At various points, Defendant moves to limit categories of the Government's evidence to "the minimum necessary" in view of Mr. Williams' offers to stipulate. (Def. Mot. 14-15.)  As a general matter, "[a] defendant's Rule 403 objection offering to concede a point generally cannot prevail over the Government's choice to offer evidence showing guilt and all the circumstances surrounding the offense."  Old Chief v. United States, 519 U.S. 172, 183

30

(1997). Accordingly, the Court declines preemptively to limit the Government's proof to the "minimum necessary" to prove the elements of the offense. Naturally, if there are specific pieces of evidence that Defendant believes are particularly prejudicial and have no probative value in view of an offer to stipulate, Defendant should timely object.

## VIII.   911 Call & DNA Evidence

The Court reserves ruling on the admissibility of the full 911 call and Defendant's motion to suppress DNA derived from the water bottle.

**CONCLUSION**

With the exception of (1) the motions to admit particular portions of the 911 call and (2) Defendant's motion to suppress the DNA evidence, which the Court shall address separately, the January 6 motions in limine are granted in part and denied in part.

**SO ORDERED.**

Dated:    New York, New York
          January 26, 2026

_____
LORETTA A. PRESKA
United States District Judge