UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>-against-<br>LAMAR WILLIAMS,<br>Defendant. | 22-CR-600 (LAP)<br>OPINION AND ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

Following a seven-day trial, a jury convicted Defendant Lamar Williams of racketeering conspiracy, murder in aid of racketeering, and murder through the use of a firearm during and in relation to a drug trafficking conspiracy. Williams now moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.[1] For the reasons that follow, Williams' motion is DENIED.

[1] See Defendant's Motion for Judgment of Acquittal, Dkt. 95 (Def. Mot.); Government's Memorandum of Law in Opposition to Defendant's Motion for Judgment of Acquittal, Dkt. 98 (Gov. Opp.); Defendant's Reply in Support of Motion for Judgment of Acquittal, Dkt. 99 (Def. Reply.)

## FACTUAL BACKGROUND[2]

### A. The Mac Ballers' Racketeering Conspiracy

The evidence at trial established that Williams was a member and leader of the Mac Baller Brims, a Bronx-based street gang that is also affiliated with the national Bloods gang. Among other activities, the Mac Ballers traffic illegal drugs, orchestrate murders, and deploy violence to obstruct criminal investigations into the gang's activities—including by threatening witnesses and their families during this trial and, at times, in this very courthouse.

Williams, who also used the aliases "Black" and "Little Black," committed numerous crimes with the Mac Ballers over a multiyear period. In the early 2010s, Williams and the Mac Ballers repeatedly purchased crack cocaine in New York and sold the crack in Pennsylvania. (Tr. 378.) Among the Pennsylvania locations from which the Mac Ballers sold crack were two bars in Easton: "Louie's" and "Eddie G's." (Tr. 81.) Key members of the Easton operation included Williams, Carl Wilbright (also known as "City" and sometimes "Brodie"), and Anton Vareen (also known as "Pretty

---

[2] The following facts are drawn from the trial record and described in the light most favorable to the Government. United States v. Mi Sun Cho, 713 F.3d 716, 719 (2d Cir. 2013). "Tr." refers to the trial transcript, (Dkts. 110, 112, 114, 116, 118, 120, and 122), while "GX" refers to Government Exhibits admitted at trial.

Black").[3] Williams, City, and Pretty Black also worked with a bartender at Louie's and Eddie G's, Jennifer Delgado, who later began a sexual relationship with City. (Tr. 84.)

Delgado, who testified under no cooperation agreement with the Government, provided a detailed account of the Mac Ballers' operations in Easton and Williams' involvement. (Tr. 89.) Delgado explained that she started selling drugs because she was raising her daughter alone and needed extra money. (Tr. 65.) Eventually, with Delgado's acquiescence, the Mac Ballers began storing and selling crack out of the bars at which Delgado worked. (Tr. 86-88.) Delgado also testified that she sometimes travelled to New York with City and on one occasion picked up Williams to bring him back to Easton. (Tr. 85-86.) On one of these trips to New York, Delgado and City were stopped by the police, (Tr. 86), as was separately reflected in police records. (Tr. 211-12.)

Delgado further testified that City exercised strict control over both the drug distribution operation and her personally. Among other things, City set strict limits on which individuals could sell out of the bars and with whom Delgado was permitted to associate. (Tr. 87.) Those who violated these directives or disrespected the Mac Ballers were met with violence. (Tr. 87.)

---

[3] The Government introduced documentary evidence of Williams' relationship with City and Pretty Black, including an Instagram story after Pretty Black's death in which Williams eulogized Pretty Black as "Forevermydon." (GX-624F.)

For example, Delgado recounted the previous Mac Baller murder of "Head" at Eddie G's by one of Williams' Mac Baller associates, "Dolo." (Tr. 98-100.) After Head was shot, Delgado performed CPR and attempted unsuccessfully to revive Head, after which City admonished Delgado for coming to Head's aid. (Tr. 99.) City, Delgado, Williams, Dolo, and Pretty Black then went to a hotel room, where the Mac Ballers debriefed and laughed about Head's murder. (Tr. 100.) The day after the murder, the Mac Ballers returned Dolo to New York, with Delgado and Dolo in one car and City, Williams, and another Mac Baller trailing behind. (Tr. 101.) City later warned Delgado to "shut up" and "say I didn't see anything" when asked by Pennsylvania state authorities about Head's murder. (Tr. 102.)

Beyond the Easton operation recounted by Delgado, other cooperating witnesses also described the Mac Ballers' crack distribution in the Bronx and Williams' role in it. Kaseem Kidd, a former Mac Baller, testified that he and Williams sold crack together in and around the Bronx River Houses and in Easton. (Tr. 374-78.) Another former Mac Baller, Deonte Morrison, similarly testified that he and Williams sold crack out of a "trap house" on Allerton Avenue in the Bronx, where crack was bagged for street sale. (Tr. 726-36.) Still another cooperator, Joseph Costello, testified that he and Williams sold crack together in the

Courtlandt Avenue area of the Bronx, as well as at the Allerton trap house. (Tr. 583–84, 596–97.)

**B. Barton's Relationship With Delgado**

The Mac Ballers' archrivals, the Crips, also operated in Easton. One of the Crips in Easton was Rasheed Barton, also known as "Birdman" and "Chi Chi." (Tr. 104.) City and other Mac Ballers already had "some type of beef" with Barton dating back to their days in the Bronx. (Tr. 106–07.) Delgado met Barton not long after meeting City and subsequently began a sexual relationship with Barton. Because City saw Delgado as his exclusive sexual partner, Delgado's relationship with Barton placed both at a high risk of reprisal from the Mac Ballers. (Tr. 106-08.)

When City discovered Delgado and Barton's relationship, City became enraged. Delgado explained that City's view was that "if [I] can't have you, no one can have you, basically," (Tr. 108), and that City threatened to kill both Delgado and Barton as a result. The threats described by Delgado were also corroborated by contemporaneous text messages between City and Delgado:




(GX 901 (showing City's texts in white and Delgado's in green).)

As threatened, City began to physically abuse Delgado. In one instance, during an argument at the back of Louie's, City grabbed Delgado by the neck and threw her against the wall. Delgado responded by smashing a cup into City's face, cutting him badly enough to require stitches. City then told Delgado that because she had "cut a Blood" and was not herself a Blood, "you have to get cut back or something has to happen to you." (Tr. 126-28.)

Ultimately, City made good on his threats by directing two women to attack Delgado at a birthday party in Easton, which was also attended by Barton, City, Williams, and numerous other Mac Ballers. (Tr. 132.) At the party, Barton told Delgado that he feared the Mac Ballers would kill him that very night, after which the two agreed to leave separately to avoid attracting attention.

(Tr. 133.) When Delgado exited to her car, she was ambushed by the two women and stabbed numerous times before a bystander intervened. (Tr. 134-36.) Delgado was severely wounded by the stabbing, as corroborated by records from St. Luke's Hospital in Bethlehem, Pennsylvania. (GX-701.)

Barton later picked up Delgado from the hospital and took her home, after which Barton and a friend, Akeem Jaudon, remained with Delgado for about two weeks while she recovered. Both Barton and Jaudon were armed out of fear that the Mac Ballers would return. (Tr. 136-37.)

**C. The August 11, 2013 Murder of Barton**

After the attack on Delgado, Barton told Delgado that he was worried about returning to the Bronx out of fear that City and the Mac Ballers "had a hit out on him." (Tr. 140.) Barton not only feared City but was also "scared of what was going to happen to him if anyone that associated with City . . . saw him" in the Bronx. (Tr. 142.) At some point in August 2013, Barton nonetheless returned to the Bronx for a birthday party. (Tr. 142.)

As Barton feared, City had in fact placed a "deal"—or bounty—on Barton's head. Kaseem Kidd testified that on the night of August 11, 2013, Kidd and another Mac Baller, "T Money," were informed by "Snow" that "Birdman" (Barton) was officially "a Mac

deal." (Tr. 414-17.) By "taking the deal" and killing Barton, a Mac Baller would stand to advance his position in the gang. (Tr. 559, 578.) Kidd and T Money then walked to 1595 East 174th Street, where they found Williams. (Tr. 418.)

Williams told Kidd that Williams "need[ed] the grip" because "Birdman [Barton] is out here;" as Kidd explained, a "grip" is Mac Baller parlance for a gun. (Tr. 418.) After some time, T Money eventually retrieved a gun and handed it to Williams. (Tr. 418-20.) Kidd then saw Williams make his way with the gun towards Bronx River Avenue, after which Kidd "heard gunshots not too long after [Williams] walked that way." (Tr. 420.) After Kidd heard the gunshots, Williams later returned to the group looking "panicky" and returned the gun to T Money. (Tr. 420-21.)

Akeem Jaudon, Barton's friend, separately testified that he and Barton were by a store on East 174th Street on the night of August 11. (Tr. 234-35.) At some point, Jaudon witnessed a fight break out. (Tr. 235-36.) Eventually Jaudon saw that Barton had been shot and remained with Barton until the paramedics arrived. (Tr. 236-37.) Jaudon identified the person with whom Barton had been fighting as "some little kid named Little Black," Williams' alias. (Tr. 238.)

**D. Events Following Barton's Murder**

Word of Barton's murder spread quickly within the Mac Baller and Crip communities. Delgado recalled that several women came to Louie's reporting that Barton had been killed. City was present in the bar when the news broke. After seeing Delgado crying, City told Delgado to "shut the f*ck up" and "clean my face up" and that Delgado should feel "lucky that it wasn't me." (Tr. 142-43.)

After Barton's murder, police placed flyers around the Bronx River Houses neighborhood showing a still image from the surveillance video. Kidd subsequently told Williams that he "heard they had pictures of [Williams] up on the block." (Tr. 422.) Williams acknowledged the flyers and told Kidd that it was "hot over there," meaning the Bronx. (Tr. 422.) Accordingly, at some point after the shooting, Williams left the Bronx.

On August 22, 2013, twelve days after the shooting, Williams was stopped by police in Allentown, Pennsylvania. Williams then provided a false name ("Josh Colon") and birthdate to officers. When later confronted by the officers, Williams admitted he had lied because he feared he "was in trouble in New York." (Tr. 841.)

Back in Easton, City continued to menace Delgado. A few months after Barton's murder, City summoned Delgado to a hotel outside of Easton, threatening to kill Delgado's daughter if she did not appear. (Tr. 145-46.) After Delgado arrived, City told

Delgado that her stabbing was a consequence of her relationship with Barton and that she should "keep [her] mouth shut" about the stabbing if asked to cooperate with authorities. (Tr. 147.) In the course of threatening Delgado, City told Delgado that Barton had been killed by Williams at a bodega in the Bronx. Specifically, City told Delgado that Williams had "ID'd" Barton and told City that Barton was present, after which City authorized Williams to murder Barton. Noting that Williams had shot Barton twice with a .22 caliber gun, City boasted that Barton, "a big ass ni**a," had "died over a little ass bullet." (Tr. 148.)

**E. Williams' Post-Murder Admissions**

In addition to Delgado's conversation with City, two other witnesses testified that Williams personally admitted to murdering Barton. Costello recalled a conversation in which Williams told Costello that (i) Williams had killed a man "on Bronx River," (Tr. 621); (ii) Williams had shot the man because of a "fight" "over a female and drugs," (Tr. 621); (iii) the man "got the best of him," and that Williams "ran off, . . . got a gun and . . . shot him," (Tr. 621); (iv) the murder happened near "a barber shop and Chinese store" on a warm night, (Tr. 621); (v) the man "didn't know [Williams] had the gun on him because he had shorts on," (Tr. 621); and (vi) Williams "threw [the gun] in the incinerator," (Tr. 622). Costello also testified that the killing elevated Williams to "Big Mac," a status conferred by Pretty Black and City. (Tr. 622.)

Deonte Morrison, meanwhile, recounted similar conversations in which Williams told Morrison that Williams had shot a man at Bronx River and "left him in the garbage." (Tr. 730.) Williams also told Morrison that Williams "couldn't go back there" (to the Bronx) as a result of the shooting. (Tr. 729-31, 758-60.)

Publicly, Williams embraced the identity of a Mac Baller shooter in rap videos he posted under the alias "Chase Money Marz." Costello identified Williams as the person rapping in the videos (see GX-501A, GX-501B, GX-503A, GX-503B), in which Williams and other Mac Ballers appeared and repeatedly displayed the Mac Baller hand sign. (Tr. 585-95.) In one such video, Williams rapped that "[b]efore I started f*cking with this rap shit, know I started off as a Big Mac shooter," while making what Costello translated as the Mac Baller hand sign. Costello explained that Williams' self-identification as a "Big Mac shooter" was a reference to "a big homie that's known for shooting." (Tr. 591.) Williams also rapped that "all my ni**as got a body" or a "homi" (homicide), which Costello explained as a reference to murders committed by Williams and his associates. (Tr. 589.)

**F. The Retaliatory Shooting of Williams**

Although Williams' status in the Mac Ballers improved from the shooting, Williams also became a target for retaliation from Barton's associates. As Williams feared, in April 2014, approximately eight months after Barton's murder, Williams was

shot in the Bronx in an apparent retaliation for killing Barton. Costello testified that Williams later told Costello that the April 2014 shooting was a result of one of Barton's associates trying to "line" Williams—that is, set him up—"[b]ecause [Williams] killed his mans" on Bronx River. (Tr. 620-21.) Morrison, too, testified that Williams confided to Morrison that Williams had been shot at Bronx River in connection with the prior shooting. (Tr. 729.)

Williams also described the shooting and its retaliatory motive in his rap videos. Consistent with his comments to Morrison and Costello, Williams rapped that "some ni**as put some money on me" and "tried to sick a f*ckin' dummy on me," but that "he ain't kill me, he just hit me," and that "it ain't official unless you catch that body." (GX-503B.) Costello explained this to mean that the person who shot Williams had tried but failed to kill him. (Tr. 595-96.)

Williams was carrying a firearm at the time he was shot. Although Williams disposed of the firearm before emergency services arrived, the firearm was later recovered and traced to Williams through DNA analysis performed by the NYPD. (Tr. 704-08.)

**LEGAL STANDARD**

A defendant mounting a Rule 29 sufficiency challenge faces a heavy burden. Jury verdicts are entitled to "strong deference" in our federal criminal system and the Court "must 'draw all

permissible inferences . . . and resolve all issues of credibility in favor of the jury's verdict.'" United States v. Martinez, 110 F.4th 160, 171 (2d Cir. 2024) (quoting United States v. Osuba, 67 F.4th 56, 61 (2d Cir. 2023)).

Rule 29 "does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." United States v. Jabar, 19 F.4th 66, 76 (2d Cir. 2021). Instead, the Court must view the evidence in the light most favorable to the Government, and the verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Landesman, 17 F.4th 298, 319 (2d Cir. 2021) (emphasis in original) (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)). To be sure, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." Id. at 320 (quoting United States v. Hawkins, 547 F.3d 66, 71 (2d Cir. 2008)). Short of that, however, the choice belongs to the jury. And where "'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible,' the court 'must let the jury decide the matter.'" Id. at 319

(quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)).

Nowhere is the Court's deference greater than on questions of credibility, which remain solely within the province of the jury. The jury is "free to believe part and disbelieve part of any witness's testimony," Martinez, 110 F.4th at 173 (internal quotation marks omitted); after all, "the maxim falsus in uno, falsus in omnibus is permissive and not mandatory," id. (quoting Calderone v. Naviera Vacuba S/A, 204 F. Supp. 783, 789 (S.D.N.Y. 1962) (Weinfeld, J.)). And because a reviewing court, including this one, cannot know whether the jury credited a witness in whole or in part, it must necessarily resolve every question of credibility in favor of the verdict. Id. at 171.

## DISCUSSION

### A. Counts Two and Three: Murder In Aid of Racketeering and Murder Through Use of A Firearm

The crux of Williams' argument is that the Government failed to introduce sufficient evidence identifying Williams as the shooter who killed Barton. As a threshold matter, a great deal of Williams' arguments, though couched in terms of Rule 29 sufficiency, are in fact credibility arguments that were raised at trial and rejected by the jury. At various points, Williams argues that the Government's witnesses were "compromised," (Def. Mot. at

18), "fabricat[ed] evidence," (id. at 9), and were otherwise "unsuitable to provide credible trial testimony," (id. at 11.) Williams also suggests that City's incriminating statements to Delgado were unreliable because City may have been trying to "frame" Williams. (Id. at 6.) Finally, Williams points to alleged inconsistencies, such as purportedly different accounts of what Williams was wearing on the night of the shooting, that Williams argues cast doubt on the reliability of the witnesses. (Id. at 7.)

Putting aside whether these characterizations are faithful to the record, such arguments are entirely out of bounds in the context of a Rule 29 motion. At bottom, "[i]t is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." United States v. O'Connor, 650 F.3d 839, 855 (2d Cir. 2011) (internal quotation marks omitted). Indeed, the Court of Appeals has reversed district courts for overturning verdicts on the basis of credibility issues that far exceed those alleged here.[4] See, e.g. United States v. Truman, 688 F.3d 129, 140 (2d Cir. 2012). By inviting the Court essentially to reject

[4] It is only in rare and "exceptional circumstances" that a district court may intrude upon the jury's credibility determinations and find testimony non-credible as a matter of law, such as where a witness's testimony "defies physical realities." United States v. Olazabal, 610 F. App'x 34, 37 (2d Cir. 2015) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). Williams' arguments fall well short of that threshold.

or discount the testimony of Delgado and the Government's cooperators, Williams asks the Court to undertake the very inquiry that the Court of Appeals has expressly prohibited. This the Court will not do.

With Williams' credibility arguments put aside, his remaining sufficiency challenges quickly fail. Williams faults the Government for not introducing forensic evidence, such as DNA. Williams ignores, however, the well-settled rule that the Government is not required to rely on direct evidence to sustain a conviction. On the contrary, the Government "is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt." United States v. Vertil, 566 F. App'x 36, 38 (2d Cir. 2014) (quoting United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008)). Williams also challenges the probative weight of particular pieces of evidence, such as the surveillance video introduced by the Government. That, too, misconstrues the Rule 29 standard. Whether direct or circumstantial, the evidence "must be viewed in its totality, as each fact may gain color from others." Landesman, 17 F.4th at 319 (quoting United States v. Cassese, 428 F.3d 92, 98-99 (2d Cir. 2005)).

At the end of the day, five different witnesses implicated Williams as the shooter. Two of those witnesses had firsthand

knowledge from the night in question: Kidd testified that Williams brought a gun towards Bronx River Avenue, after which Kidd heard gunshots a short time later and saw Williams return the gun, while Akeem Jaudon testified that he saw Williams in a fight with Barton moments before the shooting. Still two other witnesses, Joseph Costello and Deonte Morrison, each testified that Williams later admitted that he had shot a man on Bronx River. The fifth witness, Jennifer Delgado, testified that City had not only identified Williams as the shooter, but described to her intimate details of the shooting, including the precise caliber of that Williams weapon used.[5]

"The law is well established that a federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." United States v. Florez, 447 F.3d 145, 155 (2d Cir. 2006) (internal quotation marks omitted). On this record, a reasonable jury could find, beyond a reasonable doubt, that Williams was the shooter in question. Williams' sufficiency challenge to Counts II and III must therefore fail.

---

[5] The jury also heard that Delgado had identified "L.B" (Little Black) as Barton's killer when testifying to a Pennsylvania grand jury in an entirely different criminal prosecution in 2014, (Tr. 148, 191-94, 204-06), and that Delgado, in her own colorful words, had not so much as received "even a cup of coffee" from the Government in exchange for her testimony, (Tr. 201-02).

### A. Count One: Racketeering Conspiracy

Although Williams' opening brief does not develop any challenges to his conviction on Count I (racketeering conspiracy), Williams raises, for the first time in his reply, an argument that the Government failed to prove the drug weight (280 grams of crack cocaine) tied to one of the predicate racketeering acts found by the jury. (Def. Reply at 8.)

Putting aside that arguments raised in reply are waived, United States v. Blanco, 811 F. App'x 696, 706 (2d Cir. 2020), Williams' argument also fails on the merits. Far from offering mere "generalized impressions of drug dealing," (Def. Reply at 9), numerous witnesses provided particularized accounts of Williams' involvement in the drug distribution at issue and the quantity of drugs that were purchased or sold. Deonte Morrison testified that he bagged crack cocaine with Williams at the Allerton trap house, that he would bag "20 grams, 30 grams" of crack at a time, and that the Allerton trap house would sell in excess of a hundred bags per day. (Tr. 734-35.) And Kaseem Kidd testified that he personally observed Williams purchase an estimated 30 to 40 grams of crack in one single transaction, in addition to the weekly sales from Williams' crew over a number of years that exceeded the five to ten grams per week that Kidd himself sold. (Tr. 376-77.) On this record, a reasonable jury could conclude that 280 grams or more of crack cocaine were distributed.

Williams also faults the Government for failing to produce any "ledger," "seized inventory tied to Williams, or "laboratory quantity proof linked to transactions involving him," or "any actual quantity calculation attributable to him." (Def. Reply at 9.) This misstates the law. The Government can meet its drug weight burden by introducing "evidence from which quantity can, through inference, be logically approximated or extrapolated." United States v. Pauling, 924 F.3d 649, 657 (2d Cir. 2019). In a conspiracy, that includes not only transactions in which the defendant personally participated, but also "transactions in which he did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him," or "quantities he agreed to distribute or possess with intent to distribute regardless of whether he ultimately committed the substantive act." Id. (internal quotation marks omitted). A reasonable jury could draw either inference from the testimony that the Government's cooperating witnesses provided, including Morrison's account that Williams bagged drugs at the Allerton trap house in coordination with City and others. (Tr. 735.)

## CONCLUSION

For the foregoing reasons, Williams' Rule 29 Motion is DENIED. The Clerk of Court shall close Dkt. 95, and the parties shall appear for the previously scheduled sentencing on July 6.

**SO ORDERED.**

Dated: New York, New York
July 3, 2026

Loretta A. Preska

LORETTA A. PRESKA
Senior United States District Judge